NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0161n.06

Case No. 24-1096

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 25, 2025
KELLY L. STEPHENS, Clerk

JASON MICHAEL MILES,

    Petitioner-Appellant,

v.

MICHELLE FLOYD, Warden,

    Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

OPINION

Before: WHITE, READLER, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** A jury convicted Jason Miles of two counts of second-degree criminal sexual conduct. The Michigan Court of Appeals affirmed his convictions. Miles then petitioned for a writ of habeas corpus in federal court. The district court denied his petition. We affirm.

**I.**

In 2006, Jason Miles married the mother of E.W., who was six years old at the time. Miles and E.W.'s mother eventually divorced, but while they were married, E.W. lived with them.

Several years after the divorce, E.W. started seeing a new therapist. In E.W.'s first session with therapist Karen Schulte, E.W. disclosed that she had been sexually abused. Schulte reported the abuse to the Michigan Department of Health and Human Services, which opened an investigation. As part of that investigation, Detective Kristine Shuler asked Miles if he would answer some questions at the police station. Miles agreed to do so.

Miles was later charged with four counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(a), and two counts of second-degree criminal sexual conduct, *id.* § 750.520c(1)(a). E.W. was the alleged victim of each count.

In preparation for trial, Miles emailed one of his trial attorneys asking him to retain an expert on "how memories can be corrupted over time." R. 7-13, PageID 945. The trial attorney told Miles that he had consulted an expert about that and the expert's opinion aligned with the opinion of the prosecutor's expert, so he would seek another opinion. Eventually, trial counsel chose to use the defense theory that E.W. fabricated the allegations against Miles.

The case proceeded to trial. At trial, E.W. testified that Miles would regularly abuse her twice a day during the time that Miles and her mother were married. E.W. stated that she had suppressed memories of the abuse and those memories later resurfaced as flashbacks, so it was not until years later that she realized she had been sexually abused.

Detective Shuler testified about the investigation, including her interview of Miles. During Miles's ten-minute interview, Detective Shuler confronted him about E.W.'s allegations of sexual abuse. Detective Shuler testified at trial that, upon hearing the allegations, Miles's demeanor changed, and he ended the interview shortly thereafter. The prosecutor did not seek to admit any of Miles's statements made during Miles's interview with Detective Shuler. Miles's trial attorneys, however, insisted that the jury see the entire video recording of the interview to counter Detective Shuler's depiction, and the trial court permitted it. At the end of that video, Miles stated he would need to speak with an attorney.

Miles testified in his own defense that the allegations were false. Miles also testified about his interview with Detective Shuler and why he requested an attorney.

The jury convicted Miles of the two counts of second-degree criminal sexual conduct and acquitted him of the four counts of first-degree criminal sexual conduct. Miles subsequently moved for a new trial, "arguing that his counsel was ineffective for failing to seek the opinion of an expert in suggestibility and for making several errors at trial." *People v. Miles*, No. 335731, 2018 WL 3440790, at *1 (Mich. Ct. App. July 17, 2018) (per curiam). Miles also requested E.W.'s counseling records or, alternatively, "that the trial court review the records *in camera* to determine whether disclosure was appropriate." *Id.* The trial court denied Miles's motion for a new trial and the request to order in camera review or disclosure of E.W.'s therapy records. *Id.*

A divided panel of the Michigan Court of Appeals affirmed. *Id.* at *1, 11. Judge Shapiro dissented because he believed an evidentiary hearing was necessary to properly decide Miles's ineffective-assistance-of-counsel claims. *Id.* at *11 (Shapiro, J., dissenting). The Michigan Supreme Court declined additional review. *People v. Miles*, 926 N.W.2d 806 (Mich. 2019) (mem.); *People v. Miles*, 932 N.W.2d 609 (Mich. 2019) (mem.).

Miles filed a petition for writ of habeas corpus in federal court. The district court denied his petition and granted a certificate of appealability on the following ineffective-assistance-of-counsel claims: "(1) that trial counsel was ineffective for failing to call Dr. [Katherine] Jacobs as an expert witness on the issue of [E.W.'s] memory and susceptibility to improper forensic interview techniques[;] (2) that counsel was ineffective for playing to the jury an unedited recording of a police interview in which he twice asked to see an attorney" and then ended the interview; and "(3) that trial counsel was ineffective for failing to move prior to trial to obtain an *in camera* review of [E.W.'s] counseling records." *Miles v. Floyd*, No. 2:20-cv-12987, 2024 WL 199540, at *10 (E.D. Mich. Jan. 18, 2024). Miles timely appealed.

**II.**

We review de novo the district court's denial of a writ of habeas corpus. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). We review the district court's findings of fact for clear error and its legal conclusions de novo. *Daniel v. Burton*, 919 F.3d 976, 978 (6th Cir. 2019).

Because the Michigan Court of Appeals decided Miles's postconviction claims on the merits in the first instance, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs. AEDPA mandates a "highly deferential" review standard. *Davis v. Ayala*, 576 U.S. 257, 269 (2015). It permits the issuance of a writ of habeas corpus under two "narrow circumstances" when the state court has already adjudicated the habeas petitioner's claims. *Brown v. Davenport*, 596 U.S. 118, 125 (2022). Those two circumstances are when the state-court decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *Andrew v. White*, 145 S. Ct. 75, 80 (2025) (per curiam).

Miles seeks to proceed under the first circumstance. He argues that the Michigan Court of Appeals' decision rejecting his ineffective-assistance-of-counsel claims was contrary to clearly established federal law or, in the alternative, involved an unreasonable application of federal law. A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "[A] state court unreasonably applie[s] clearly established federal law" when it "unreasonably applie[s] 'the holdings . . . of th[e Supreme] Court's decisions.'" *Andrew*, 145 S. Ct. at 80 (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). A

habeas petitioner must show that the state court "correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts of" his case. *Williams*, 529 U.S. at 407–08. An unreasonable application of federal law is an application "with which no fairminded jurist would agree." *Andrew*, 145 S. Ct. at 80 (citation omitted).

## III.

As an initial matter, Miles argues that AEDPA deference is unconstitutional. Specifically, Miles contends that, in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), federal courts cannot afford deference to a state court's interpretation of the federal constitution because federal courts must maintain their independent judgment over federal cases. Thus, Miles would have us review his habeas claim without providing any deference to the Michigan Court of Appeals. This argument suffers from multiple deficiencies.

*First*, *Loper Bright* does not address AEDPA or AEDPA deference. *Loper Bright* discarded the *Chevron* deference doctrine as established by the Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). 603 U.S. at 412. The *Chevron* deference doctrine required federal courts to defer to a federal agency's reasonable interpretation of a statute that "is silent or ambiguous with respect to the specific issue at hand." *Id.* at 379–80 (internal quotation marks omitted). Now, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," as required by the Administrative Procedure Act ("APA"). *Id.* *Loper Bright* thus focused on the APA, which requires federal courts to "decide all relevant questions of law," 5 U.S.C. § 706, and the relationship between federal agencies and federal courts.

*Second*, federal courts still must decide questions of law under AEDPA. The Supreme Court "ha[s] always held that federal courts, even on habeas, have an independent obligation to

say what the law is." *Williams*, 529 U.S. at 411 (quotation omitted). And "[a] federal court acts within its discretion when it 'say[s] what the law is' and corrects state courts' unreasonable application of clearly established federal law." *Upshaw v. Stephenson*, 97 F.4th 365, 379 (6th Cir. 2024) (second alteration in original) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). And AEDPA does not direct federal courts to defer to a state court's construction of the Constitution. Rather, AEDPA mandates that state courts are bound by "clearly established Federal law, as determined by the Supreme Court" and that habeas relief is limited to when the state court unreasonably applies, or issues a decision contrary to, federal law. 28 U.S.C. § 2254(d)(1).

*Third*, AEDPA deference allows federal courts to show respect to the role that state courts play in resolving state criminal cases. "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (quotation omitted). AEDPA is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions," *id.*, while still allowing habeas petitioners to present their claims to federal courts, 28 U.S.C. §§ 2241(a), 2254(a).

For these reasons, we decline to hold that *Loper Bright* impliedly overturned AEDPA deference. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (opining that courts of appeals "should follow the [Supreme Court] case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions" (quotation omitted)).

**IV.**

On the merits, Miles argues that he is entitled to habeas relief because his trial attorneys did not represent him properly in state court. The U.S. Constitution's Sixth Amendment, as applied to the States through the Fourteenth Amendment, gives a criminal defendant "the right . . . to have

the Assistance of Counsel for his defence." U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963). "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quotation omitted).

To prove an ineffective-assistance-of-counsel claim, a defendant must prove that his attorney performed deficiently, and that the attorney's deficient performance prejudiced the defendant at trial. *Id.* at 687. An attorney provides deficient performance to a defendant if his representation "fell below an objective standard of reasonableness," as defined by "prevailing professional norms." *Id.* at 688. And such deficiency gives rise to prejudice only if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Our analysis of an ineffective-assistance-of-counsel claim is "doubly deferential when, as here, a state court has decided that counsel performed adequately." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (internal quotation marks omitted). So when combining AEDPA deference with the *Strickland* standard, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

**V.**

Miles raises three ineffective-assistance-of-counsel claims on appeal: (1) trial counsel failed to retain an expert on human memory; (2) trial counsel played the entire recording of Miles's

interview with police for the jury, including his invocation of his right to counsel; and (3) trial counsel failed to request E.W.'s psychological records. We address each in turn.

**A.**

Miles first challenges his trial attorneys' decision not to procure an expert on human memory and susceptibility. When considering a claim that a defendant's trial attorney failed to hire an expert, "we owe deference to both . . . counsel *and* the state court." *Reeves*, 594 U.S. at 739. "[S]trategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Id.* (quoting *Richter*, 562 U.S. at 104). And while defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," those investigations are themselves retrospectively reviewed with a "heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Thus, the question before us on habeas review is simply whether there is "any reasonable argument" that trial counsel's efforts to find an expert were professionally reasonable as explained in *Strickland*. *See Richter*, 562 U.S. at 105.

There is such an argument. Miles's trial attorneys investigated and chose the defense theory that E.W. intentionally fabricated the sexual-abuse allegations against Miles. This theory was incompatible with the theory of the expert retained by Miles's postconviction attorney that E.W.'s memories were real but unreliable.

Before selecting the intentional-fabrication trial strategy, one of the trial attorneys explored the memory theory. He consulted with an expert who provided the same opinion as the state prosecutor's expert. The trial attorney advised Miles that he would seek out a second opinion. Trial counsel ultimately chose a defense strategy focused on E.W. fabricating the allegations rather than her unreliable memory, thereby eliminating the need for Miles's suggested expert on human

memory. After selecting a certain defense strategy that did not require an expert on human memory, it was reasonable for the trial attorneys to forego any further investigation based on Miles's request. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 107.

And the trial attorneys' strategy worked to some extent. The jury found Miles not guilty of the most serious charges. *Miles*, 2018 WL 3440790, at *1. Miles has failed to show that "*every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision." *Reeves*, 594 U.S. at 740 (alterations and internal quotation marks omitted). According the appropriate deference to the trial attorneys' strategic decisions and the Michigan Court of Appeals, Miles has not shown that his trial attorneys performed deficiently by not retaining an expert on memory and suggestibility. The Michigan Court of Appeals found that trial counsel sufficiently "investigated the matter and, having concluded that an expert's testimony would not be beneficial to [Miles], made the strategic decision to pursue a different trial strategy." *Miles*, 2018 WL 3440790, at *3. As such, we reject his claim that the Michigan Court of Appeals' decision on this claim was contrary to, or an unreasonable application of, federal law.

Miles focuses his argument on the purported prejudice he suffered from not having an expert on memory and suggestibility presented at trial. He relies on the opinion of Dr. Katherine Jacobs. Dr. Jacobs opined that E.W.'s memory was unreliable, and that, through improper interviewing or counseling techniques, or through the suggestion of others around her, she could have been reporting tainted or even false memories. But because the trial attorneys' investigation of experts and strategic decision to use an intentional-fabrication defense rather than a memory-and-suggestibility defense were not deficient, we need not reach the prejudice prong. It was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense

counsel could follow a strategy that did not require the use of" an expert on memory and suggestibility. *Richter*, 562 U.S. at 106–07.

**B.**

Miles next argues that his trial attorneys provided ineffective counsel by playing the entire police interview video in which Miles invokes his right to counsel and refuses to answer questions related to the investigation into E.W.'s allegations against him.

On November 4, 2015, Detective Schuler interviewed Miles in connection with the E.W. investigation. At trial, Detective Schuler testified that Miles abruptly ended the interview after requesting an attorney. Detective Schuler described Miles's demeanor during the interview as anxious and that he began to sweat and became pale when she mentioned the allegations about E.W. On cross-examination, one of Miles's trial attorneys attempted to elicit the substance of the interview with Detective Schuler but was met by a hearsay objection from the government. Eventually, trial counsel played the entire interview recording for the jury, including Miles's request for an attorney. Miles subsequently testified about the video recording and reiterated he asked for an attorney after "being accused of something [he] didn't do." R. 7-7, PageID 690. The state prosecutor's closing argument emphasized Miles's demeanor during the interview and suggested that an innocent person would not have acted the way Miles did, including his expressed need to seek counsel, when confronted with similar allegations. Given that, Miles argues his trial counsel was ineffective for allowing the jury to hear his request for an attorney at the end of the police interview.

To the extent Miles challenges the use of his pre-arrest silence as evidence of guilt, that argument is a nonstarter. Although prosecutors may not, when a defendant is subjected to custodial interrogation, use post-*Miranda* warning silence as substantive evidence at trial, *Miranda v.*

*Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court has held that if the defendant did not expressly invoke his right to remain silent, prosecutors may use a defendant's pre-arrest silence as evidence of his guilt or for impeachment purposes, *Salinas v. Texas*, 570 U.S. 178, 191 (2013) (plurality opinion); *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014). Here, it is undisputed that Miles's participation in the interview was voluntary, and he was not under arrest at any point during the interview. And Miles did not expressly invoke his right to remain silent by refusing to speak to Detective Schuler. *See McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir. 2001). Thus, the state prosecutor could permissibly use Miles's pre-arrest silence and Miles's trial counsel was not ineffective for failing to object. The Michigan Court of Appeals' determination on the state prosecutor's use of Miles's pre-arrest silence and any subsequent failure to object did not involve an unreasonable application of federal law, nor was it contrary to federal law.

We next consider the trial attorneys' decision to play the entire video recording of Miles's interview. Detective Schuler testified that Miles was anxious, sweaty, and turning pale during the interview and that he ended the interview abruptly by refusing to speak further until he had a lawyer. The trial attorneys showed the entire interview recording to the jury to counter the Detective Schuler's depiction of Miles's demeanor and how the interview ended. This was a strategic decision for the jury to independently evaluate Miles's demeanor.

Miles relies only on Judge Shapiro's dissent to argue that showing the entire video was unreasonable and prejudicial. Judge Shapiro reasoned that trial counsel's failure to edit the video to exclude Miles's request for counsel "may have substantially affected the jury's decision, particularly in light of the prosecution's reliance on this testimony during closing arguments." *Miles*, 2018 WL 3440790, at *11 (Shapiro, J., dissenting). But trial counsel's attempt to combat the prosecutor's portrayal of the interview necessitated playing the full recording. By playing the

entire interview recording, the jury could determine if Miles seemed anxious, sweaty, or pale, and it could observe the way the interview ended, rather than relying on any conflicting representations of the interview. Following this logic, it was reasonable for the trial attorneys to play the entire video because the prosecutor opened the door about Miles's demeanor during the interview and the circumstances surrounding the interview's ending.

In response, Miles offers nothing more than a recitation of the trial facts related to this issue and a lengthy quote from Judge Shapiro's dissent as support for his second ineffective-assistance-of-counsel claim. He offers no "clearly established Federal law" that the Michigan Court of Appeals' decision "was contrary to, or involved an unreasonable application of." *See* 28 U.S.C. § 2254(d)(1).

## C.

Finally, Miles argues that his trial attorneys were ineffective for failing to request E.W.'s therapy records. Miles's appellate counsel filed a post-trial motion seeking the production and review of these records, and the court denied it.

In Michigan, a defendant may access a victim's confidential records if the defendant can show that he "has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense." *People v. Stanaway*, 521 N.W.2d 557, 574 (Mich. 1994). Relying on Dr. Jacobs's affidavit, Miles claims that E.W.'s therapy records would reveal whether she denied abuse allegations when specifically asked and detail how her disclosure gradually evolved during therapy and "other potential sources of contamination." R. 3-5, PageID 348.

The Michigan Court of Appeals rejected this argument. *Miles*, 2018 WL 3440790, at *5. The court noted that E.W.'s therapy records would have been used to promote Dr. Jacobs's defense

- 12 -

theory—that E.W.'s memories were the result of outside influences rather than completely fabricated. *Id.* And because the court had already found that Dr. Jacobs's theory ran contrary to the trial attorneys' reasonable strategy to show that E.W. intentionally fabricated the allegations against Miles, E.W.'s records were unnecessary to the defense, and the pretrial motion would have been denied. *Id.*

But the decision to present the intentional-fabrication theory at trial does not fully justify trial counsel's decision to forgo requesting the counseling records because those records could have meaningfully supported the intentional-fabrication theory presented at trial. Miles' trial theory "was that the victim intentionally fabricated the allegations of sexual abuse as a way to explain behavioral issues she was having at the time she sought therapy." *Id.* at *1. As Miles explains, past counseling records could reveal how E.W.'s story "gradually evolved during the course of therapy," D. 21 at p.57, which may help demonstrate how E.W.'s alleged lie developed. Counseling records could also shed light on E.W.'s behavioral problems—that is, her alleged motive for lying. Indeed, Miles asserts that "there is no trial strategy that would justify trial counsel's failure to secure the records." *Id.* at 58.

Miles has not shown, however, that the Michigan Court of Appeals "violate[d] clearly established federal law" in holding that trial counsel did not perform deficiently. *Dunn*, 594 U.S. at 738–39. Miles cites only one case in which a court applying AEDPA deference found that an attorney was constitutionally deficient for failing to request counseling records: *Brown v. Smith*, 551 F.3d 424 (6th Cir. 2008), *overruled on other grounds by Cullen v. Pinholster*, 563 U.S. 170 (2011). In *Brown*, the state prosecutor's case rested on the victim's credibility, and the victim's counselor informed the defendant's attorneys that she did not believe the victim's allegations and that her counseling notes would be helpful to the defense without compromising confidentiality.

*Id.* at 430–31.  Still, the defendant's attorneys did not contact the victim's counselor or seek those records.  *Id.*  But here, there is no evidence that E.W.'s counselor disbelieved E.W.—much less that the counselor voluntarily sought to assist the defense.  And because *Brown* is the only precedent Miles identifies, he has failed to show that the state court's decision was contrary to, or an unreasonable application of, federal law.

## VI.

For these reasons, we **AFFIRM** the district court's judgment.